UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM KELLY,<br><br>                    Plaintiff,<br><br>          v.<br><br>RETIREMENT PLAN COMMITTEE<br>a/k/a SC PENSION PLAN COMMITTEE<br>a/k/a STANADYNE PENSION COMMITTEE<br>a/k/a STANADYNE RETIREMENT<br>BENEFITS COMMITTEE,<br><br>                    Defendant. | CIVIL ACTION<br>3:11-CV-01890 (WGY) |

YOUNG, D.J.[1]                                    May 19, 2016

**FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER FOR JUDGMENT**

## I.   INTRODUCTION

William Kelly ("Kelly") retired from his position as Senior
Vice President and Chief Technical Officer at Stanadyne
Corporation ("Stanadyne" or the "Company") in 2009.  Am. Compl.
¶ 5, ECF No. 74-2.  Based on his compensation at Stanadyne,
Kelly qualified for retirement benefits distributed under the
Company's Benefit Equalization Plan ("BEP") and Supplemental
Retirement Plan ("SERP") (collectively, the "Non-Qualified

---

[1] Of the United States District Court for the District of
Massachusetts, sitting by designation.  See Order of Transfer,
ECF No. 52.

Plans"), in addition to the retirement benefits payable under
the Company's pension plan (the "Pension Plan").  Id. ¶¶ 4-9;
R., Ex. P1(cont'd), Stanadyne Corporation Pension Plan ("Pension
Plan"), ECF No. 32-44; R., Ex. P2, Stanadyne Benefit
Equalization Plan ("BEP"), ECF No. 32-48; R., Ex. P3, Stanadyne
Supplemental Retirement Plan ("SERP"), ECF No. 32-49.  In 2004,
following the acquisition of Stanadyne by Kohlberg & Company
("Kohlberg"), Kelly received cash distributions (the "Option
Proceeds") related to his participation in Stanadyne's
Management Stock Option Plan (the "Option Plan") as well as a
sale bonus (the "AIP Bonus") from American Industrial Partners
("AIP") -- Stanadyne's former owner.  Am. Compl. ¶¶ 11-12; R.,
Ex. 31, William Kelly Earnings Statement, ECF No. 32-32.

     In 2007, Kelly complained to Stanadyne management about the
exclusion of the Option Proceeds and the AIP Bonus from the
computation of his retirement benefits under the Non-Qualified
Plans.  R., Ex. 23, ECF 32-23.  In April 2008, Kelly submitted
his official claim for benefits to the Stanadyne Pension
Committee (the "Pension Committee" or the "Committee").  R., Ex.
25, RE: William Kelly-Retirement Benefits ("Claim Letter"), ECF
No. 32-25.  The Committee denied Kelly's claim both in the first
instance and following an internal appeal.  Kelly then filed
suit against Stanadyne in 2011 in the United States District
Court for the District of Connecticut.  Compl., ECF No. 1.  The

complaint was brought under Section 502 of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-
1461, against the Committee.  It contains three counts, but
Count II was dropped.  See Mot. Withdraw Count II Compl., ECF
No. 24; Elec. Order, ECF No. 25.  Count I is a claim for pension
benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), in which
Kelly alleged that the Committee was arbitrary and capricious in
interpreting one of the key terms employed in the computation of
the Non-Qualified Plans' benefits, and amending the Non-
Qualified Plans in a manner that violated the Non-Qualified
Plans' internal "anti-cutback provision."  See Compl. ¶¶ 49-51.
Kelly also alleged that these actions by the Committee, which
effectively excluded the value of the Option Proceeds from the
calculation of his benefits under the Non-Qualified Plans,
violated ERISA's anti-cutback provision, 29 U.S.C. § 1054(g)(1),
as well as ERISA's notice provision, 29 U.S.C. § 1054(h).  In
Count III, Kelly requested attorneys' fees pursuant to ERISA, 29
U.S.C. § 1132(g)(1).  See Compl. ¶¶ 52-55.

In late 2012, the parties made cross motions for summary
judgment supported by memoranda and opposed each other's
motions.  Pl.'s Mem. Supp. His Mot. Summ. J. ("Pl.'s SJ Mem.
2012"), ECF No. 31; Mem. Law Opp'n Pl.'s Mot. Summ. J. ("Def.'s
Opp'n 2012"), ECF No. 44; Mem. Law Supp. Def.'s Mot. Summ. J.
("Def.'s SJ 2012"), ECF No. 35-1; Pl.'s Reply Mem. ("Pl.'s Opp'n

2012"), ECF No. 42; Mem. Law Reply Pl.'s Reply Mem. Opp'n Def.'s

Mot. Summ. J. ("Def.'s Reply 2012"), ECF No. 46.  On January 10,

2013, the case was transferred to this session.  Order Transfer,

ECF No. 52.  At a case-stated hearing held on July 25, 2013,[2] the

Court blundered, ruling that Stanadyne was a proper party to

this ERISA action, and that SERP was an ERISA plan; the Court

"reject[ed] the [defendant's] argument that the funds in

question were not paid by the defendant . . . [and] that the

funds were not paid for personal services."  Elec. Clerk's

Notes, ECF No. 67.

    Following an agreement by the parties to again proceed on a

case-stated basis (for the remaining issues), October 2, 2013

Order, ECF No. 69, the Court issued an order on June 16, 2014,

in which it held that BEP was an unfunded benefit plan not

subject to ERISA.  Order ("Order"), ECF No. 70.  The Court also

invited both parties to submit briefing on the state law

applicable to Kelly's BEP-related claims.  Id.  On July 16,

2014, in response to the Court's Order, both parties submitted

supplemental memoranda of law briefing the relevant issues of

Connecticut state law.  Suppl. Mem. Law Supp. Def.'s Mot. Summ.

---

    [2] For other examples of case stated hearings, see, for
example, Bryant v. Europadisk, Ltd., No. 07 CIV.3050, 2009 WL
1059777, at *1 (S.D.N.Y. Apr. 15, 2009), aff'd sub nom. Bryant
v. Media Right Prods., Inc., 603 F.3d 135 (2d Cir. 2010)
(collecting cases).

J., ECF No. 71; Pl.'s William Kelly Suppl. Mem. ("Kelly's Suppl. Mem."), ECF No. 72.

On February 18, 2015, the Court revised its July 25, 2013 ruling, holding this time that Stanadyne was not a proper party to an action alleging violations of ERISA and, as a result, dismissed Kelly's complaint with leave to amend within thirty days to join the proper party or parties.  Order ("Second Order") 2, 8, ECF No. 73.

On March 10, 2015, Kelly filed an Amended Complaint, naming the Committee as defendant in this ERISA action.  Am. Compl., ECF No. 74-2; Mem. Supp. Mot. Am., ECF No. 74-1.  In the Amended Complaint, Kelly realleges Count I of his initial Complaint as well as Count III (renumbered Count II after Kelly withdrew his claim for breach of fiduciary duty).  Am. Compl. ¶¶ 49-55.  On July 31, 2015, the Committee filed a motion for summary judgment, a District of Connecticut Local Rule 56(a)(1) statement and a supporting memorandum of law.  Def.'s Mot. Summ. J., ECF 82; Local Rule 56(a)(1) Statement, ECF No. 82-1; Mem. Law Supp. Mot. Summ. J. ("Def.'s Mot."), ECF No. 82-2.  Kelly filed his opposition to the Committee's motion for summary judgment on September 3, 2015.  Pl.'s William Kelly's Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 83.  Two weeks later, the Committee filed a memorandum replying to Kelly's opposition.  Mem. Law Reply Pl.'s Opp'n Def.'s Mot. Summ. J.,

[5]

ECF No. 85.  Following the October 7, 2015 case stated hearing,
Minute Entry, ECF No. 88, the Court now makes its findings of
fact and rulings of law.

## II.  FINDINGS OF FACT

The Court first discusses the terms of the Stanadyne
pension plans, followed by a chronological discussion of the
relevant facts preceding Kelly's claim and of Kelly's claim and
his internal appeal.  The Court also makes a separate finding of
fact regarding the Committee's past inclusion of the Option
Proceeds in its computation of pension benefits for other
employees.

### A.   The Terms of the Non-Qualified Plans and the Pension Plan

The Non-Qualified Plans in question are designed to provide
benefits that bypass limitations imposed by two provisions of
the Internal Revenue Code, Sections 415 and 401(a)(17), with
which a qualified plan such as the Pension Plan need otherwise
comply.  26 U.S.C. §§ 415, 401(a)(17); Aramony v. United Way of
Am., 254 F.3d 403, 407 (2d Cir. 2001).

The BEP is "intended to be an excess benefit plan in excess
of the limitations imposed by Section 415 of the Internal
Revenue Code of 1986, as amended, upon benefits of employees" of

[6]

Stanadyne participating in the Pension Plan.[3]  BEP Background. The BEP benefit is calculated as "the benefit the Participant would have received under the Pension Plan if there had been no Section 415 Limitation, but taking into account the limitations of Section 401(a)(17) of the Internal Revenue Code as amended." BEP § 2.1.

Meanwhile, the SERP "provide[s] retirement income benefits in excess of those permitted from time to time under Code Section 401(a) for qualified retirement plans" for "a select group of management or highly compensated employees[.]"  SERP §§ 2.1, 2.2.  The benefit under SERP is computed as the difference between "the benefit . . . under the applicable provisions of the Pension Plan . . . without regard to any limitation on such benefit imposed under said Pension Plan on account of the limitations of [Internal Revenue] Code Sections 401(a) or 415" and the sum of the benefit under the Pension Plan and the benefit under the BEP.  SERP § 4.1.

For salaried Stanadyne employees such as Kelly, the formula for computing benefits under the Pension Plan resides in

---

[3] Section 401(a)(17) imposes an annual cap on the amount of annual compensation that could be considered for the computation of qualified pension benefits.  26 U.S.C. § 401(a)(17).  Section 415 of the Internal Revenue Code imposes additional limitations on the amount of annual benefits payable from a pension plan that comports with limitations imposed by Section 401 of the Internal Revenue Code of 1986, as amended.  26 U.S.C. § 415.

Appendix D-1.  Pension Plan, Appendix D-1, ECF No. 32-46.  The
Pension Plan benefit is a function of an employee's "Average
Monthly Earnings," which is, in turn, a function of an
employee's total "Earnings" over a period of time.  See id.
Under the Pension Plan, "Earnings" is defined as the sum of "the
total compensation paid . . . . for personal services" including
some pre-tax contributions, excluding some "compensation
received . . . through an insured program" and, most relevantly,
under Section 2(b)(iv) in Appendix D-1 (the "exclusion clause"),
excluding "the amount of any payments made . . . . under a
management incentive program or agreement with [Stanadyne] which
by its own terms excludes payments therefrom from the definition
of Earnings under the [Pension] Plan."  Id. at Section 2(b)(ii)-
(iv) (emphasis supplied).

     As administrator of the Pension Plan, the Committee has
"the exclusive right to interpret the [Pension] Plan in its sole
discretion."  Pension Plan § 9.5.  The Committee's powers with
respect to the administration of the Non-Qualified Plans are
even more expansive, as laid out in both the SERP and BEP:

> The Benefits Committee shall have the power and duty to
> do all things necessary or convenient to effect the
> intent and purposes of the Plan and not inconsistent
> with any of the provisions hereof, whether or not such
> powers and duties are specifically set herein, and, by
> way of amplification and not limitation of the
> foregoing, the Benefits Committee shall have the power
> to:

[8]

(A) provide rules and regulations for the management, operation and administration of the Plan, and, from time to time, to amend or supplement such rules and regulations;
(B) construe the Plan, which construction, as long as made in good faith, shall be final and conclusive upon all parties hereto; and
(C) correct any defect, supply any omission, or reconcile any inconsistency in the Plan in such manner and to such extent as it shall deem expedient to carry the same into effect, and it shall be the sole and final judge of when such action shall be appropriate.

SERP § 5.3; BEP § 5.3.

These powers are subject to the following limitations:

The Plan may be amended, modified, suspended, or terminated by the Board of Directors if and when it deems such action necessary, provided, however, that notwithstanding the foregoing, no such amendment, modification, suspension or termination shall reduce the benefit to which the Participant or spouse was entitled immediately prior to such amendment, modification, suspension, or termination.

SERP § 6.3; BEP § 6.4 (henceforth the "SERP anti-cutback provision").

**B.    Kelly's Employment with Stanadyne[4]**

Kelly was employed by Stanadyne for approximately 27 years before retiring in 2009 from his position as Senior Vice President and Chief Technical Officer.  Local Rule 56(a)(1) Statement ¶¶ 1-2.  Kelly is a participant in Stanadyne's Pension

---

[4] Certain background facts presented in this section are taken from the Committee's statement of undisputed material facts, which has only been relied on when Kelly does not dispute the particular fact cited.  See generally Local Rule 56(a)(1) Statement (listing facts that the Committee does not dispute).

[9]

Plan as well as its Non-Qualified Plans, which were adopted in 1992. Id. ¶ 6; Pension Plan; BEP; SERP.  The pension plans were frozen as of March 31, 2007, ceasing benefit accrual.  R., Ex. P1, Stanadyne Corporation Pension Plan 1, ECF 32-47; R., Ex. 22, Estimate SERP Benefit March 31 email Rodgers to Kelly, 2007 ("Kelly Estimate"), ECF No. 32-22.

Kelly is currently retired and is receiving benefits under all three plans.  Local Rule 56(a)(1) Statement ¶ 5.  Kelly was also a participant in Stanadyne's Management Stock Option Plan ("Option Plan"), a program that was amended in 1998 to allow for immediate vesting upon a change of control event.  R., Ex. 31, Amendment Stanadyne Automotive Holding Corp. Management Stock Option Plan ("Option Plan Amendment"), ECF No. 32-32.

In 1997, Stanadyne was acquired by American Industrial Partners ("AIP").  R., Ex. 34, Re: Appeal Benefit Claim Behalf William Kelly ("Appeal Response") 4, ECF No. 32-40.  In connection with that acquisition, Kelly received payments reported on his W-2 under the 1997 Equity Participation Plan ("1997 Equity Plan").  Id.; R., Ex. 32, Amended and Restated Equity Participation Promotion Agreement ("Equity Participation Agreement"), ECF No. 32-37; R., Ex. 38, 1997 Kelly W-2, ECF No. 32-38.  These payments were excluded from the computation of pension benefits under all three plans.  Appeal Response 4. Importantly, the Equity Participation Agreement contained no

[10]

clause related to pension benefits (i.e., it contained no exclusionary language).

In 2004, the private equity firm Kohlberg & Company ("Kohlberg") acquired Stanadyne from AIP. Local Rule 56(a)(1) Statement ¶ 13. In August 2004, in relation to this acquisition, Kelly received a cash payout of stock options under the Option Plan, the Option Proceeds, and a sale bonus from AIP (again, the "AIP Bonus") for a total of $2,517,140. R., Ex. 31, Re: Stanadyne Automotive Holding Corp. – Outstanding Stock Options ("Option Pay-Out Letter"); R., Ex. 31, William Kelly Earnings Statement. These payments were reported as ordinary income on Kelly's 2004 W-2. R., Ex. 31 (cont'd), 2004 Kelly W-2, ECF No. 32-32. These payments were in addition to Kelly's salary for 2004, which exceeded $250,000. R., Ex. 31 (cont'd), William W. Kelly Earning Statement ("2004 Earning Statement"), ECF No. 32-32.

C.   **Committee Proceedings Prior to Kelly's Claim**

The events that are at the core of Kelly's challenge to the Committee's treatment of the Non-Qualified Plans' benefits precede the filing of his claim. In June 2005, in a series of emails, Jean McCarthy ("McCarthy"), then Stanadyne's Vice President for Human Resources, inquired of Louis Stevens ("Stevens"), Stanadyne's Treasurer, and afterwards of Steve Langin ("Langin"), Stanadyne's Chief Financial Officer, and

[11]

William Gurley ("Gurley"), Stanadyne's President and CEO, about the definition of "total compensation" and whether the Option Proceeds, which were classified as ordinary income, were included in "total compensation" and, thus, in "Earnings," under the Pension Plan. R., Exs. 1-4, 6, 7, ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-6, 32-7.

On September 1, 2015, the Committee, composed of Gurley, Langin, McCarthy, and Stevens, met to discuss the issues raised by McCarthy. R., Ex. PP1, Minutes SC Pension Committee Meeting - September 1, 2005 ("September 2005 Minutes"), ECF No. 32-50. According to the minutes, the Committee concluded that the Option Proceeds and the AIP Bonus, although distributed to select employees as ordinary income, were not classified as "Earnings," "[i]n accordance with the intent of senior management[.]" Id. The Committee so concluded even though none of the documents relating to these payments contained language excluding them from "Earnings" under the Pension Plan. This absence is significant, because though the Committee's understanding at the time was that Appendix D-1 of the Pension Plan required "a specific exclusion for any form of compensation to a participant; otherwise the compensation [was] considered as Eligible Earnings for Pension." Id.

Following instructions from the Committee to reach out to external counsel for advice on "a course of action to ensure

[12]

that the [Option Proceeds and AIP Bonus] may properly be

excluded from Eligible Earnings for Pension[,]" id., Stevens

contacted Natalie Welsh ("Welsh") from Shipman & Goodwin,

explaining that

> [t]he intent of the management is to exclude the [AIP]
> Sale Bonus and the Option [Proceeds] from earnings
> considered from pension. Due to an oversight, the
> documents related to these payments do not exclude them
> from Earnings under the Stanadyne Pension Plan as
> specified in Appendix D-1 Section (b)(iv) of the Plan
> Document[,]

and asking Welsh to

> . . . advise [] on a course of action to remedy the
> deficiency in the documentation to ensure these sale-
> related payments may properly be excluded from Earnings
> considered for pension.

R., Ex. 8 ("Stevens Email Welsh"), ECF No. 32-8 (emphasis

added).

   In a subsequent email to the other members of the

Committee, McCarthy expressed concern about Stevens' mandate to

Welsh, which she characterized as one of improperly asking the

attorney to "find a way" to insure that the Option Proceeds and

the AIP Bonus were not categorized as "Earnings," instead of

making a more direct inquiry as to whether, based on the

language of the relevant documents, the payments should be

included in "Earnings." R., Ex. 12 ("McCarthy Sept. 21, 2005

email"), ECF No. 32-12. The record in this case (the "Record")

contains no information on whether McCarthy's email received a

response.

The next chronological entry in the Record is an October 2005 meeting of the full Committee: the meeting minutes again reiterate senior management's intent to exclude the Option Proceeds and AIP Bonus from "Earnings" while adding that the absence of exclusionary language in the payments documentation is "clearly an oversight, an omission, resulting from the substantial number of events occurring during the period when the payouts occurred" and that Shipman & Goodwin was to advise the Committee "on how to remedy the deficiency." R., Ex. PP2, Minutes SC Pension Plan Committee Meeting – October 27, 2005 ("October 2005 Minutes"), ECF No. 32-51.

At the Committee's following meeting on December 19, 2005, Shipman & Goodwin, via Welsh, provided the requested advice. Record, Ex. PP3, Minutes Retirement Plan Committee Meeting – December 19, 2005 ("December 2005 Minutes"), ECF No. 32-27. Welsh advised the Committee to continue to treat the Option Proceeds as "Earnings" under the Pension Plan because "inadvertent errors or omissions [were] difficult to correct under [Stanadyne's] Pension Plan." Id. The Non-Qualified Plans, however, "permit[ted] corrections for omission and as such should be amended to exclude the [Option Proceeds] of August 6, 2004 and all future equity-based compensation." Id. Welsh finally added that, because the AIP Bonus was not

[14]

compensation from Stanadyne, it did not qualify as Earnings under the Pension Plan. Id.

Following Welsh's advice, Langin submitted an amendment to the SERP, "excluding from compensation (i) cash payments made in 2004 in return for the cancellation of in-the-money rights under outstanding stock options in the Company, and (ii) any equity-based payments to a Participant on or after January 1, 2006." R., Ex. PP3, Stanadyne Automotive Corp. Supplemental Retirement Plan Amendment No. 1 (2005-1st) ("2005 Amendment"), ECF No. 32-27. According to the minutes, the amendment was adopted with three votes in favor -- Gurley, Langin and Stevens.[5] December 2005 Minutes. McCarthy opposed the 2005 Amendment because she considered it to be a retroactive reduction of benefits in

---

[5] Kelly argues the 2005 Amendment was improperly adopted because the vote was not unanimous, and bases this assertion off Langin's representations, both in internal correspondence and correspondence with outside counsel. R., Ex. 16, ECF No. 32-16; R., Ex. 13, ECF No. 32-13. SERP's rules on quorum provide that "[a] majority of the members of the Benefits Committee shall constitute a quorum for any meeting with respect to the Plan, and the acts of the majority of the members present at any meeting at which a quorum is present, or the acts unanimously approved in writing by all such members, shall be valid acts." SERP § 5.2. Thus, according to the minutes, a majority voted for the amendment, hence the act was valid despite the absence of a unanimous written ratification. The Court need not, however, decide this issue. Even if the 2005 Amendment was not properly adopted, as discussed later in this memorandum, the Committee mainly relies on the interpretation of the term "compensation" and not on the validity of the 2005 Amendment to justify its denial of Kelly's claim. See infra Section III-A-2-b.

[15]

violation of the SERP's anti-cutback provision.  Id.  To clarify
whether the amendment was an adequate remedy, the Committee
agreed to seek legal advice from a second firm.  Id.

In a March 2006 email, Langin contacted Ropes & Gray to
provide a second opinion on the 2005 Amendment and the Option
Proceeds.  R., Ex. 13 ("Langin email Ropes & Gray"), ECF No. 32-
13.  In a later email, McCarthy raises the issue of a potential
conflict of interest in choosing Ropes & Gray to conduct the
second review, given the firm's role as counsel to Kohlberg
during the acquisition of Stanadyne.  R., Ex. 18 ("McCarthy
email Langin, May 10, 2006"), ECF No. 32-18.

The Record does not include a copy of the legal opinion
that Ropes & Gray provided on the issue; it does, however,
include a series of emails between Stephen Rodgers, Stanadayne's
new Treasurer, Local Rule 56(a)(1) Statement ¶ 38, and Langin
discussing an April 2006 meeting between Welsh and Jonathan Zorn
from Ropes & Gray and the lawyers' differing opinions.  R., Exs.
14-16 ("Emails between Rodgers and Langin"), ECF Nos. 32-14, 32-
15, 32-16.  At the meeting, Zorn argued that the term "total
compensation" was ambiguous given that Stanadyne already
excluded some taxable items but not others from "total
compensation."  R., Ex. 16.  According to Zorn, this created
ambiguity in the term "pensionable earnings," allowing the
Committee to exercise its discretion to define "compensation" in

[16]

line with its definition in Section 415 of the Internal Revenue
Code ("IRC"), which excludes non-qualified stock options such as
the Option Proceeds.  Id.  The Committee could rely on this
interpretation without amending the language of the Non-
Qualified Plans, Zorn stated, as long as the intent had always
been to exclude the Option Proceeds from "compensation."  Id.
Welsh disagreed with Zorn's interpretation and continued to
favor her 2005 December Committee meeting recommendations that
had resulted in the 2005 Amendment.  Id.

In July 2006, the Committee met again to discuss the
lawyers' recommendations.  R., Ex. PP4, Minutes Stanadyne
Pension Committee Meeting -- July 7, 2006 (July 2006 Minutes"),
ECF No. 32-53.  Three out of the four Committee members were
present: David Jones ("Jones"),[6] Langin, and Rodgers, with
McCarthy not in attendance.  Id.  The Committee agreed with
Zorn's interpretation and "voted to exclude such [stock option]
payouts in the calculation of pensionable earnings going
forward."  Id.

D.   **Past Inclusion of Option Proceeds in Computation of
     Benefits**

---

[6] Jones became CEO of Stanadyne, replacing Gurley, after the
acquisition of Stanadyne by Kohlberg -- the subsequent Committee
meeting minutes reflect this change in Committee membership.
See Local Rule 56(a)(1) Statement ¶47.

The Court makes a separate finding that is crucial to the
resolution of Kelly's claim.  One of the April 2006 emails from
Rodgers to Langin, while discussing Zorn's interpretation of the
term "compensation" under the Pension Plan and his view that the
exclusion of stock options from the Non-Qualified Plans' benefit
computation must entail their exclusion from the Pension Plan
benefit computation, also mentions that Stanadyne was paying two
retirees under the Plan and Zorn's suggestion that the retirees'
pensions be reduced going forward.  Ex. 15 ("Rodgers email
Langin April 12, 2006"), ECF No. 32-15.

In this context, the Court finds that Stanadyne included
the Option Proceeds when computing at least some retirees'
benefits under the Pension Plan.[7]  This conclusion is buttressed
by emails between Ropes & Gray counsel Sabrina Glaser ("Glaser")
and Committee members about documents that were relevant to
Kelly's appeal of his claims.  Ex. 32, Items Committee Meeting
This Afternoon ("Emails Ropes Committee"), ECF No. 32-37.  In

---

[7] This finding is not undermined by the Committee's language
in the letter denying Kelly's appeal of his claim that states
that: "[t]he Committee discovered through its review of the
record that the Company had computed benefits under [the Non-
Qualified Plans] consistently with the interpretation clarified
in the [2005] Amendment for purposes of reporting such benefits
to the participants themselves."  Re: Appeal Benefit Claim
Behalf William Kelly ("Appeal Letter") 6, ECF No. 32-40.  The
Committee's language makes no reference to the inclusion of the
Option Proceeds in the computation of the benefits under the
Pension Plan.

those emails, Glaser sought confirmation that under the Pension
Plan only three people had received benefits whose calculation
included Option Proceeds, and three had initially received such
benefits but later had their benefits recalculated.  See id.
Rodgers replied that he was forwarding counsel confirming
documents, see id.   The Court, however, was unable to find such
documents in the Record.

    **E.   Kelly's Claim and the Committee's Decision**

In October 2007, Kelly wrote to Rodgers asserting that his
benefits under the Non-Qualified Plans improperly excluded the
Option Proceeds and the AIP Bonus.  R., Ex. 23.  Rodgers replied
by listing reasons that the above payments were properly
excluded: the Option Proceeds were similar to the excluded 1997
Equity Plan payments; the Option Proceeds had always been
excluded from the computation of benefits; Section 415 of IRC
excluded income from non-qualified stock options from
compensation; and the Non-Qualified Plans had been amended by
the 2005 Amendment.[8]  R., Ex. 24 ("Rodgers Letter Kelly October

---

    [8] Rodgers' response states that the 2005 Amendment
specifically excluded income derived from a change in control.
Rodgers Letter Kelly October 2007.  This is not a correct
description of the 2005 Amendment language.  See 2005 Amendment
(the 2005 Amendment excluded from compensation "(i) cash
payments made in 2004 in return for the cancellation of in-the-
money rights under outstanding stock options in the Company, and
(ii) any equity-based payments to a Participant on or after
January 1, 2006").

2007"), ECF No. 32-24.  On April 21, 2008, Kelly formally filed his claim for benefits with the Committee.  Claim Letter.  Kelly asserted that both the Option Proceeds and the AIP Bonus were part of "total compensation" because they had been treated as ordinary income and included on his 2004 W-2 form, they were not specifically excluded from Earnings, and the 2005 Amendment was a violation of the Non-Qualified Plans' anti-cutback provision since it retroactively reduced benefits.  Id. at 2-3.

    The Committee officially denied Kelly's claim through a letter from Ropes & Gray attorney Loretta R. Richard ("Richard") on July 18, 2008.  R., Ex. 27, Re: Benefit Claim Behalf William Kelly ("Denial Letter"), ECF No. 32-27.  At the time of that decision, the members of the Committee were McCarthy, Langin, Jones, and Rodgers.  Local Rule 56(a)(1) Statement ¶ 47.  The Committee based its determination on: (1) the Committee's consistent interpretation of the "Earnings" definition in Appendix D-1 of the Pension Plan to include regular pay such as wages and exclude "special pay" such as equity-based compensation; (2) guidance from Section 415 of the IRC's definition of "compensation" that excludes gain realized upon exercise of a stock option; (3) the AIP Bonus not being an amount paid by Stanadyne; (4) the Committee's power under the terms of the Non-Qualified Plans to make amendments to cure omissions and make clarifications; (5) the 2005 Amendment's

[20]

being a mere clarification and not a violation of the
Supplemental Plan's anti-cutback provision.  Denial Letter 1-3.

On October 16, 2008, Kelly filed his appeal from the
decision.  R., Ex. 31, Re: William Kelly – Retirement benefits
("Kelly's Appeal"), ECF No. 32-31.  Kelly repeated the arguments
made in his initial claim for benefits and rebutted the
Committee's arguments in the Denial Letter, in particular
arguing that the definition of "Earnings" and, by reference,
that of "compensation" in the Pension Plan is not ambiguous and,
thus, the Committee does not have discretion to interpret it.
Id. at 3-8.

According to Kelly, the relevant "compensation" could be
excluded from "Earnings" only if its documentation contained
language specifically excluding it, under Appendix D-1(b)(iv) of
the Pension Plan.  Id. at 5.  In support of this argument, Kelly
pointed to a clause in Stanadyne's 1999 Performance Incentive
Plan that specifically excluded that payment from the
computation of pension benefits.  Id. at 6; R., Ex. 14,
Stanadyne Automotive Corp. 1999 Performance Incentive Plan (PIP)
2 ("1999 PIP"), ECF No. 32-36.  Kelly also alleged that his
claim did not receive a "full and fair review by the Committee"
as evidenced by some of the Committee minutes showing the
Committee more concerned with Stanadyne's financial health than
with the best interest of the Non-Qualified Plans' participants,

and by the Committee's failure to provide Kelly, in spite of his repeated requests, with formal minutes and the names of Committee members that considered and decided his claim.  Id. at 8-9.  On December 17, 2008, Kelly's counsel requested that the Committee provide him with any written legal opinions on which the Committee relied in its interpretation of the Non-Qualified Plans.  R., Ex. 33, ECF No 32-39.  No such formal minutes or written legal opinions are contained in the Record.

The Record does include, however, minutes of a Committee meeting from October 24, 2008, discussing Kelly's appeal.  R., Ex. 36 ("October 24, 2008 Committee Minutes"), ECF No. 32-42. In attendance were Langin, Rodgers, Jones, McCarthy, and Ropes & Gray attorneys Richard and Glaser.  Id. at 1.  Richard stated that she agreed with the advice of previous counsel that clarifying amendments were permitted in the Non-Qualified Plans. Id.  She also explained to the Committee that, when reviewing a plan participant's claim, it must act "in the best interests of the plan participants," without taking into account the financial consequences for Stanadyne.  Id. at 2.  Jones indicated his view that the Committee "take a fresh view of the matter" in order to provide Kelly with a "full and fair review" of his claim.  Id.

On December 19, 2008, the Committee denied Kelly's appeal, expanding upon the reasoning offered in its initial denial.  Re:

[22]

Appeal Benefit Claim Behalf William Kelly ("Appeal Letter"), ECF
No. 32-40.  In its response to Kelly's appeal, the Committee
first asserted that it had provided Kelly with all the relevant
documents for his appeal.  Id. at 2.  The Committee also
disputed Kelly's assertion that he had not been afforded a "full
and fair review" pointing to the Committee's choice of having
only Rodgers and Jones participate in Kelly's appeal because the
other two Committee members, Langin and McCarthy, were Plans
members and could "potentially personally benefit" from the
Committee's decision.  Id.  As additional evidence of the fair
review afforded to Kelly, the Committee asserted that it had met
at least three times to review Kelly's claim, looked at facts
not brought to its attention by Kelly and endeavored to take a
"fresh look" at the Record.  Id.  Following this process, the
Committee again determined that based on its review of the plan
language and "deal documents, Committee minutes, e-mails,
correspondence[,] . . . public filings[,] . . . . past practice
in interpreting the relevant language (relating to other
participants)," the definition of "Earnings" was ambiguous,
supporting the Committee's interpretation that it excluded the
Option Proceeds and that the 2005 Amendment did not violate the
Non-Qualified Plans' anti-cutback provision.[9]  Id. at 3.

---

[9] The AIP Bonus was deemed to fall outside "Earnings" as
payment made not by Stanadyne but by AIP.  Appeal Letter at 4.

[23]

In concluding that it had "consistently and repeatedly" excluded "special pay," such as equity-based compensation, from "Earnings," the Committee relied on Stevens' communications from 2005, which suggested he too thought the AIP Bonus and Option Proceeds should be excluded from "Earnings." Id. at 4. The letter denying Kelly's appeal also adds that Gurley himself, who had been Stanadyne's CEO from 1995 to 2006 and a member of the Committee at that time, had received pension benefits under the Non-Qualified Plans that were calculated excluding the AIP Bonus and the Option Proceeds.[10] Id.

After the exhaustion of his internal appeal process, Kelly filed the instant action, but no longer raises any claims with respect to the AIP Bonus. Kelly's claims are limited to the alleged ERISA violations resulting from the Committee's exclusion of the Option Proceeds from the calculation of Kelly's benefits under the Non-Qualified Plans.

## III. RULINGS OF LAW

Having found the preceding facts, the Court turns to Kelly's claims. Kelly's Amended Complaint raises two counts:

---

[10] For the first time in the claim review process, the Committee also made the argument that the exclusion clause in Appendix D-1 (b)(iv) of the Pension Plan was ambiguous. Appeal Letter 4. The Committee no longer makes this argument in briefing before this Court.

Count I (ERISA violation) and, Count II (attorney's fees). Am. Compl. ¶¶ 49-55.

## A.    Count I: ERISA Violations

In Count I, Kelly alleges that the Committee violated ERISA by interpreting the Pension Plan in an arbitrary and capricious manner, amending the Non-Qualified Plans in a manner that violated the Non-Qualified Plans' internal "anti-cutback provision," and finally by excluding the value of the Option Proceeds from the calculation of his benefits under the Non-Qualified Plans, which violated both ERISA's anti-cutback provision, 29 U.S.C. § 1054(g)(1), and ERISA's notice provision, 29 U.S.C. § 1054(h). See Am. Compl. ¶¶ 49-51. This Court had ruled in its June 16, 2014 Order, that the BEP is not a pension plan regulated by ERISA. Order. As it turns out, however, this ruling is of no legal moment, because his BEP claim would have failed nonetheless.[11]

---

[11] The language of the BEP makes it clear that benefits payable under that plan are subject to Section 401(a)(17) of the IRC annual compensation cap. BEP § 2.1. In 2004, this compensation cap was $205,000. Cost-of Living Adjustment for Retirement Items, IRS.GOV, https://www.irs.gov/pub/irs-tege/cola_table.pdf (last visited March 31, 2016). As reported in his December 2004 earnings statement, Kelly was paid more than $250,000 in salary for 2004, 2004 Earnings Statement, the year when Kelly also received the Option Proceeds. Thus, since Kelly's salary for 2004 was already higher than the 2004 401(a)(17) cap, the Court concludes that the Option Proceeds are immaterial in computing benefits under the BEP.

Insofar as Kelly's SERP-related claims are concerned, both parties have implicitly acknowledged in their briefs that SERP qualifies as a "top-hat plan" for ERISA purposes, see Kelly's Suppl. Mem. 1; Def.'s Mot. 15. This classification disposes of Kelly's allegations regarding violations of ERISA's notice and anti-clawback provisions.[12]

A top-hat plan is, however, still subject to ERISA's enforcement provisions under Section 502(a)(1)(B). 29 U.S.C. § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B); Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008). Thus Kelly's remaining ERISA claim is, generally, that the Committee was arbitrary and capricious in interpreting and amending the Non-

---

[12] A "top-hat plan" refers to a plan exempt from ERISA's funding, participation, vesting and fiduciary requirements but not from the statute's reporting, disclosure, administration and enforcement requirements on the basis that the plan "is unfunded and . . . maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1); Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 286-287 (2d Cir. 2000). The amendment or interpretation of a top-hat plan by its administrator is, thus, subject to neither ERISA's anti-cutback provision, 29 U.S.C. § 1054(g)(1) nor ERISA's notice provision, 29 U.S.C. § 1054(h), which fall under ERISA participation and vesting requirements. Since the 2005 Amendment only amended the SERP and Kelly's amended complaint only makes a claim that the interpretation of SERP violated ERISA's notice and anti-cutback provisions, Am. Compl. ¶¶ 51 (d)&(e), it follows that Kelly's claims of violation of ERISA's notice and anti-cutback provisions must fail.

Qualified Plans, and that this resulted in lower benefits for him under the SERP.

More specifically, this case boils down to reviewing the Committee's interpreting the term "total compensation" in Appendix D-1 of the Pension Plan to exclude Option Proceeds, because this determination controls Kelly's SERP benefits, see SERP § 4.1.  To complete this task, the Court first must determine the appropriate standard of review to apply to the Committee's interpretation of "total compensation," before applying that standard to the facts of this case.

### 1.    Standard of Review: Deference Due to the Committee

Although Kelly is concerned with the extent of his benefits under SERP, he actually contests the Committee's discretionary actions taken vis-a-vis the Pension Plan, since benefits under SERP are a function of "total compensation" under the Pension Plan.  SERP § 4.1.  Thus, although the parties dispute the correct standard of review applicable to top-hat-plan claims,[13]

---

[13] Even were the Court to treat the analysis as that of actions by administrators of a top-hat plan, the Court would reach the same conclusion.

Because top-hat plans are only partly subject to ERISA, a number of Circuits have concluded that, notwithstanding the discretion afforded to the plan's administrators, the de novo standard applies to top-hat plan reviews.  See Goldstein v. Johnson & Johnson, 251 F.3d 433, 442-443 (3d Cir. 2001); Craig v. The Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 752 (8th Cir. 2006).  But see Comrie v. IPSCO, Inc., 636 F.3d 839, 842 (7th Cir. 2011) (rejecting Goldstein's de novo reasoning

the appropriate standard of review here is that applicable to

qualified plan decisions by a plan administrator.

   "[A] denial of benefits challenged under § 1132(a)(1)(B) is

to be reviewed under a de novo standard unless the benefit plan

gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of

---

because "Firestone tells us that a contract conferring
interpretive discretion must be respected, even when the
decision is to be made by an ERISA fiduciary.  It is easier, not
harder as Goldstein thought, to honor discretion-conferring
clauses in contracts that govern the actions of non-
fiduciaries").  In the Second Circuit, the choice of standard of
review has not yet been directly addressed.  See Am. Int'l Grp.,
Inc. Amended & Restated Executive Severance Plan v. Guterman,
496 F. App'x 149, 151 (2d Cir. 2012) (declining to decide on the
appropriate standard of review for benefit challenges to top-hat
plans because the result in that particular inquiry would be the
same under either standard).
   In practice, the only standard of review that courts in
the Second Circuit have applied consistently to reviews of
rights under top-hat plans has been the arbitrary and capricious
one.  See Roganti v. Metropolitan Life Ins. Co., 786 F.3d 201,
204 (2d Cir. 2015) (reviewing under the abuse of discretion
standard a number of plans, including a top-hat one); Panecassio
v. Unisource Worldwide, Inc., 532 F.3d 101, 108-109 (2d Cir.
2008) (a top-hat plan administrator did not abuse its discretion
and was properly awarded summary judgment); Casagrande v.
Siemens AG, No. 11 CIV. 5442 RMB, 2013 WL 2489933, at *7
(S.D.N.Y. June 11, 2013) (granting summary judgment to the
administrator of a top-hat plan).  The Court would, thus, choose
to apply the standard of review that at least two decisions by
the Second Circuit have embraced and none have rejected.
   The Court also notes that choosing one standard of review
over another in the case of a plan that affords discretion to
its administrator, might make no difference in practice.
Niebauer v. Crane & Co., 783 F.3d 914, 923 (1st Cir. 2015) (when
a plan grants discretion to an administrator, employing one
standard of review over another creates a "distinction without a
difference").

the plan." <u>Panecassio</u>, 532 F. 3d at 108 (quoting <u>Firestone Tire</u> <u>& Rubber Co.</u> v. <u>Bruch</u>, 489 U.S. 101, 115 (1989)) (alteration in the original).  "Where the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard." <u>Kinstler</u> v. <u>First Reliance Standard</u> <u>Life Ins. Co.</u>, 181 F.3d 243, 249 (2d Cir. 1999) (internal quotation marks omitted); <u>see</u> Kathryn J. Kennedy, <u>Judicial</u> <u>Standard of Review in ERISA Benefit Claim Cases</u>, 50 Am. U. L. Rev. 1083, 1130-1131 (June 2001) (stating that majority view among Courts of Appeal involves applying a highly deferential standard when a plan document grants "full discretion to determine eligibility and/or to interpret plan provisions").

Here, the language of the qualified Pension Plan clearly allows the Committee to interpret the plan "at its sole discretion."  Pension Plan § 9.5.  This means that the Court must review Kelly's benefit denial that results from the Committee's interpretation of the plan under the arbitrary-and-capricious standard.

### 2.   Interpretation of the Term "Compensation" in the Pension Plan

Applying the arbitrary-and-capricious standard of review, the Court first outlines Kelly's arguments supporting his interpretation of the term "compensation," before discussing the Committee's arguments in defense of its decision to deny Kelly's

claims, and finally undertaking its own review of the relevant documents.

### a.    Kelly's Arguments

Kelly argues that the Committee undertook a "revisionist history" in finding the Option Proceeds excluded from the computation of his benefits under SERP because there was never any evidence that the Committee had intended to exclude the Option Proceeds from pensionable earnings. Pl.'s Opp'n 3. It follows, according to Kelly, that: (1) the 2005 Amendment was a violation of SERP's anti-cutback provision; and (2) the term "compensation" in the Pension Plan was not ambiguous and could only be interpreted to refer to compensation reported on W-2s. Id. at 1; Pl.'s SJ Mem. 2012 12. In particular, Kelly argues that the existence of a clause in the 1999 PIP plan that specifically excludes those payments from pensionable earnings helps his claim in two ways: it shows that the Committee knew how properly to exclude items under Appendix D-1 of the Pension Plan, and it undermines the Committee's argument that, since the intent to exclude the Option Proceeds was always present, the absence of an exclusion clause in the Option Plan documents had been merely an "oversight." Pl.'s Opp'n 2. Lastly, Kelly contends that the review of his claim was tainted by the conflicts of interest resulting from the Committee's allegiance to Stanadyne and Ropes & Gray's prior position as counsel to

[30]

Kohlberg, Stanadyne's acquirer, whose financial interests were in opposition to the plan participants' interests.   Pl.'s SJ Mem. 2012 23-25.

### b.    The Committee's Arguments

In contrast, the Committee's main argument rests on the premise that the term "compensation," which is not defined anywhere in the Pension Plan, is ambiguous and that the Committee has the discretion to interpret it according to its definition under Section 415 of the IRC.   Def.'s Mot. 21-23. The Committee also relies on the similarity between the Option Proceeds and the 1997 Equity Plan payments, the latter having been excluded from pensionable earnings even though not containing language to that effect (as would be required by Kelly's interpretation of Appendix D-1).   Id. at 22-23.

As far as the 2005 Amendment is concerned, the Committee justifies the propriety of its interpretation of the term "compensation" by arguing that the amendment did not decrease the benefits under SERP since the Option Proceeds were never part of pensionable earnings and thus the amendment did not violate the SERP's anti-cutback provision.   Id. at 31-32. Rebutting Kelly's conflicts-of-interest argument, the Committee claims that its reliance on external counsel actually bolsters the reliability of the Committee's decision.   Id. at 29.   The Committee also makes an "equitable" argument, asserting that the

Non-Qualified Plans were never intended to "provide a double benefit" to employees, such as Kelly, who had already become wealthy through Stanadyne's management stock program.  Id. at 1.

### c.   The Court's Interpretation

When determining whether an ERISA administrator has properly interpreted the plan's terms, the Court must first decide whether the terms are "ambiguous." Klimbach v. Spherion Corp., 175 F. App'x 412, 413 (2d Cir. 2006) (citing O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., 37 F.3d 55, 58-59 (2d Cir. 1994)).  As to this question of law no deference is due the committee, and the Court conducts de novo review.  See Aramony v. United Way of Am., 254 F.3d 403, 412 (2d Cir. 2001).

Throughout its "reading [of the] ERISA plan" the Court applies "familiar rules of contract interpretation." Lifson v. INA Life Ins. Co. of New York, 333 F.3d 349, 353 (2d Cir. 2003). If the terms of the plan are determined to be ambiguous, then the Court analyzes whether the administrator's interpretation of the terms was either arbitrary and capricious, or reasonable. Klimbach, 175 F. App'x at 413-14.  For this task, the Court may consider extrinsic evidence, so long as it is within the administrative record.  Id. at 413.  "If the ambiguity persists after consideration of this extrinsic evidence" and the Court is faced with "two competing yet reasonable interpretations" offered by the claimant and the administrator, the Court must

choose the administrator's interpretation.  <u>Id.</u> at 414 (citing

<u>Pagan</u> v. <u>NYNEX Pension Plan</u>, 52 F.3d 438, 443 (2d Cir. 1995)).[14]

### i.   Ambiguity

"Language is ambiguous when it is capable of more than one

meaning when viewed objectively by a reasonably intelligent

person who has examined the context of the entire integrated

agreement."  <u>O'Neil</u>, 37 F.3d at 59 (internal citation and

quotation marks omitted).  Usually, the "ordinary meaning" of a

term prevails in the interpretation of an ERISA contract, <u>see</u>

<u>Filiatrault</u> v. <u>Comverse Tech., Inc.</u>, 275 F.3d 131, 135 (1st Cir.

2001), but such a determination cannot be made "in a vacuum."

<u>Lowry</u> v. <u>Bankers Life & Cas. Ret. Plan</u>, 865 F.2d 692, 695 (5th

Cir. 1989).

In Appendix D-1 of the Pension Plan, "Earnings" is defined

as the sum of "the total compensation paid . . . . for personal

services" including some pre-tax contributions, excluding some

"compensation received . . . through an insured program" and

excluding "the amount of any payments made . . . . under a

management incentive program or agreement with the Employer

---

[14] No rule of contra preferentum applies where the
administrator has discretion to construe the terms of the plan.
<u>Pagan</u>, 52 F.3d at 443-44.  "The rule of contra proferentem is
'that when one party is responsible for the drafting of an
instrument, absent evidence indicating the intention of the
parties, any ambiguity will be resolved against the drafter.'"
<u>Id.</u> at 443 (quoting <u>O'Neil</u>, 37 F.3d at 61).

which by its own terms excludes payments therefrom from the definition of Earnings under the Plan." Pension Plan, Appendix D-1. The term "total compensation" of Appendix D-1 is not defined.

In the absence of a contractual definition, the Court looks first to the ordinary and common meaning of the term "compensation." Dictionaries provide a reliable source. See, e.g., United Techs. Corp. v. American Home Assur. Co., 989 F. Supp. 128, 144 (D. Conn. 1997) (Arterton, J.) (stating that Second Circuit courts and Connecticut courts rely on dictionaries for contractual interpretation).

The various definitions of "compensation" the Court encountered in its research[15] are expansive but inherently

_____

[15] The American Heritage Dictionary equates "compensation" with "[s]omething given or received as payment or reparation, as for a service or loss." Compensation, The American Heritage Dictionary (2nd college ed. 1982). Legal dictionaries, of similar relevance, see Lowry v. Bankers Life & Cas. Ret. Plan, 678 F. Supp. 635, 641 (N.D. Tex. 1988), aff'd, 865 F.2d 692 (5th Cir. 1989) (using the definition of "remuneration" from Black's Law Dictionary), are more specific. Black's Law Dictionary provides that compensation is "[r]emuneration and other benefits received in return for services rendered," in particular "salaries or wages." Compensation, Black's Law Dictionary (10th ed. 2014). The dictionary cites Decker & H. Thomas Felix II, Drafting and Revising Employment Contracts § 3.17, at 68 (1991), for the proposition that compensation includes "wages, stock option plans, profit-sharing, commissions, bonuses, golden parachutes, vacation, sick pay, medical benefits, disability, leaves of absence, and expense reimbursement". See also Compensation, Ballantine's Law Dictionary (3rd ed. 1969) ("remuneration for services, whether in the form of a fixed

ambiguous, suggesting only that salaries and wages constitute the core of the ordinary meaning of "compensation." Accord Lowry v. Bankers Life & Cas. Ret. Plan, 865 F.2d 692, 695 (5th Cir. 1989) (analyzing ERISA claim and ruling that the terms "compensation," "remuneration," and "home office payroll" were ambiguous). "Compensation" has not acquired a common meaning in relevant statutory provisions either, such as those of the IRC that are relevant for determining the qualified status of the Pension Plan. Compare, e.g., 26 C.F.R. § 1.415(c)-2(c) (stating "compensation" excludes proceeds from sale of unqualified stock options), with id. § 1.415(c)-2(d) (providing safe harbor provision that includes all W-2 income).

Kelly argues, however, that the presence of the exclusion clause in Appendix D-1 is sufficient to make it unambiguous that management incentive program payments, such as the Option Proceeds, are included in "total compensation" and "Earnings" unless their documents include language specifically excluding them. Pl.'s SJ. Mem. 2012 22. As opposed to clauses in defined benefit plans that mandate inclusion of payments, see, e.g., DiCioccio v. Duquesne Light Co., 911 F. Supp. 880, 897 (W.D. Pa. 1995), however, the express exclusion of certain types of payments cannot guarantee that a payment that is not expressly

_____

salary, fees, commissions, or perquisites of whatever character").

excluded must be included in the benefit calculation, <u>accord</u>
<u>United States</u> v. <u>Local 6A, Cement & Concrete Workers, Laborers</u>
<u>Int'l Union of N. Am.</u>, 832 F. Supp. 674, 679 (S.D.N.Y. 1993)
(noting that expressio unius is available as a "tool," but "need
not be mechanically applied").  In this context, the Court
cannot conclude that "total compensation" refers unambiguously
to W-2 reported income, as Kelly would like, <u>see</u> Am. Compl. ¶¶
51(a)&(b).

### ii.   Interpretation of Ambiguous Term

Although the Second Circuit has not adopted a list of
factors to consider when reviewing a plan administrator's
interpretation of an ERISA plan under the arbitrary-and-
capricious standard, other Circuits provide useful guidance:
courts should defer more if an administrator's interpretation is
consistent with the goal and purposes of the plan, <u>see</u> <u>Howley</u> v.
<u>Mellon Fin. Corp.</u>, 625 F.3d 788, 795 (3d Cir. 2010); <u>Vaughan</u> v.
<u>Celanese Americas Corp.</u>, 339 F. App'x 320, 324 (4th Cir. 2009),
and if an administrator has been consistent in its
interpretation of the plan, <u>see</u> <u>Manning</u> v. <u>Am. Republic Ins.</u>
<u>Co.</u>, 604 F.3d 1030, 1041-42 (8th Cir. 2010); <u>Vaughan</u>, 339 F.
App'x at 324.  On the other hand, a conflict of interest weakens
the case for deference.  <u>See</u> <u>Kelly</u> v. <u>Handy & Harman</u>, 406 F.
App'x 538, 539 (2d Cir. 2011).  The weight afforded to the
presence of a conflict of interest depends on the "totality-of-

[36]

the-circumstances." Roganti v. Metropolitan Life Ins. Co., 786
F.3d 201, 217-218 (2d Cir. 2015). "No weight is given to a
conflict in the absence of any evidence that the conflict
actually affected the administrator's decision." Durakovic v.
Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 140 (2d Cir. 2010)
(citation omitted).

    As a preliminary matter, interpreting the term
"compensation" in line with its definition in Section 415 of the
IRC is not per se unreasonable and does not, as Kelly argues,
Pl.'s Opp'n 4, "stretch . . . the words beyond what they can
reasonably be interpreted to mean." Laurent v.
PriceWaterhouseCoopers LLP, 794 F.3d 272, 280 (2d Cir. 2015),
cert. denied, 136 S. Ct. 981 (2016) (holding that a plan
administrator's interpretation of the ERISA statutory term
"normal retirement age" as five years of service was invalid
under ERISA since it bore no reasonable relationship to the age
at which plan participants would normally retire). As a
qualified plan, the Pension Plan is subject to Section 415
limitations, Pension Plan § 3.3 (a)(i), making the definition of
"compensation" under that Section relevant for the
interpretation of Pension Plan terms. Accord Scipio v. United
Bankshares, Inc., 119 F. App'x 431, 437 (4th Cir. 2004) (noting
that a plan administrator properly consulted IRC definitions of

[37]

"compensation" to interpret ambiguous "earnings" term in an
ERISA plan).

The Committee's choice of definition founders, however,
when analyzed for consistency with previous plan
interpretations.  The Committee, in its denial letters to Kelly,
stated that its excluding the Option Proceeds from "total
compensation" is supported by its prior exclusion of the 1997
Equity Plan payouts from pensionable earnings, including
Kelly's, because the payouts also lacked any specifically
exclusionary language.  Appeal Letter 4.  The Committee noted
other types of payments (such as special awards, relocation and
moving expenses, severance, and employee referrals) that were
excluded in the past from pensionable earnings, despite being
reported on the employee's W-2, but did not offer any evidence
of whether specifically exclusionary language was included in
these documents.  Id. at 3.  The Committee also writes that it
consistently excluded the AIP Bonus from pensionable earnings,
though the AIP Bonus was reported on Kelly's W-2.  Id. at 4.
That Kelly's proposed definition for "total compensation" is not
consistent with the Committee's carefully chosen examples from
the past is insufficient, however, to demonstrate that the
Committee's construction is reasonable.

Both in first instance and on appeal, the Committee fails
to mention that it had paid some of its retirees benefits under

[38]

the Pension Plan that were calculated on a basis that included the Option Proceeds.  This information was known to at least two of the Committee members, Rodgers and Langin, before Kelly filed his first complaint with the Committee.  See Rodgers email Langin April 12, 2006.  Rodgers and Langin had discussed the issue in a 2006 email at the time of Ropes & Gray's first determination that "compensation" was an ambiguous term, and the same information was included in documents sent to Kelly in support of his appeal.  See id.; Emails Ropes Committee.

In its Appeal Letter, the Committee states only obliquely that a review of the record showed that it had computed benefits under the Non-Qualified Plans consistent with the interpretation that the Option Proceeds were excluded from pensionable earnings.  Appeal Letter 6.  Given that pensionable earnings under the Non-Qualified Plans are a function of pensionable earnings under the Pension Plan, see SERP § 4.1; BEP § 2.1, however, it is necessary to explain the discrepancy.

The Committee's utter failure to explain why at least some retirees received Pension Plan benefits based on the Option Proceeds bars it from relying on the consistency of its interpretation of the Pension Plan, and renders immaterial other, more remote, examples of payments, such as the 1997 Equity Plan payouts.

[39]

Similarly, the Committee points to the fact that "reporting officers" Gurley and Kelly, whose pension benefits were made public in filings with the SEC on an annual basis, received benefits under the Non-Qualified Plans exclusive of Option Proceeds without objecting, until 2007 when Kelly raised the issue with the Committee.  Appeal Letter 5.  Again, the Committee fails to account for McCarthy's inquiries since 2005, focusing only on evidence that serves its chosen theory that officers of Stanadyne tacitly acquiesced in the exclusion of the Option Proceeds from pensionable earnings.  Cf. Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Cos., 935 F. Supp. 2d 278, 293 (D. Mass. 2013) (stating that an ERISA "administrator cannot simply ignore contrary evidence, or engage with only that evidence which supports his conclusion" to deny a plan participant's benefit).

The other evidence relied on by the Committee to show the consistency of its prior interpretations is the 2005 Amendment to the SERP.  Specifically, presumably referring to Stevens' emails in the Record that relate to the adoption of the 2005 Amendment, the Committee states that Stevens was "of the view that [the AIP Bonus and Option Proceeds] were excluded" from pensionable earnings.  Appeal Letter 5.  The Committee also states that the adoption of the 2005 Amendment was a

[40]

clarification of the Committee's interpretation that the Option Proceeds were excluded from SERP pensionable earnings.  Id. at 6.  Because the Committee independently interpreted the Non-Qualified Plans to exclude the Option Proceeds, the 2005 Amendment is relevant to the Committee's reasons for denying Kelly's claim insofar as it confirms, in its view, that the Committee consistently interpreted the Plan to exclude the Option Proceeds.  Id.

The above recitation, however, misrepresents the Record. Up until the involvement of Ropes & Gray in the discussion about the Option Proceeds, Committee members (including Stevens and Gurley) had made clear in the Committee minutes, in communication with counsel Welsh, as well as in internal communications following McCarthy's inquiry, that the Option Proceeds issue was one of, at most, "oversight."  September 2005 Minutes; Stevens email Welsh; McCarthy Sept. 21, 2005 email; October 2005 Minutes.  As evidenced by the minutes, this oversight was the Committee's failure explicitly to exclude the Option Proceeds from pensionable earnings, although Appendix D-1 so required for management incentive payments; what the Committee was looking for was a solution to remediate their failure to exclude.  Id.

It follows that, although the record suggests that the Committee intended to exclude Option Proceeds from pensionable

earnings, it does <u>not</u> suggest that the Committee considered the Option Proceeds as excluded from "total compensation." The Committee went to Welsh for advice on its failure to exclude the Option Proceeds in the relevant documents (as required by Appendix D-1), not for advice on the meaning of "total compensation." Since it precedes Ropes & Gray's suggested interpretation of the Plan, the Committee's inquiry is more compelling evidence of the Committee's actual intent.[16]

The Court concludes that the Committee's denial of Kelly's claim, despite ostensibly relying on multiple reasons, in fact is premised only on its interpretation of the term "total compensation, which, the Court holds, is not supported by

---

[16] The two types of potential intent are: the intent to exclude the Option Proceeds from "total compensation," and intent to exclude the Option Proceeds from "Earnings" via an express exclusion in accordance with Appendix D-1. The difference between the two might seem one of form and not of substance. It is not. If, for example, the Committee considered a certain category of payments, such as non-qualified stock options, part of "total compensation" but wanted to exclude the Option Proceeds in particular from "Earnings" and failed to include an exclusionary clause to that effect, then the Committee cannot remedy its failure with a post-hoc reinterpretation of "total compensation." <u>See</u> <u>Warner</u> v. <u>Konover</u>, 210 Conn. 150, 154-56 (1989) ("[I]n arm's length transactions, the good faith performance doctrine permits the exercise of discretion for any purpose reasonably within the contemplation of the parties but forbids the exercise of discretion for the purpose of recapturing opportunities forgone at the formation of the contract.") (citing S. Burton, <u>Breach of Contract and the Common Law Duty to Perform in Good Faith</u>, 94 Harv. L. Rev. 369, 378-92 (1980)).

[42]

evidence of the Committee's intent in the Record.[17]  To the
contrary, the evidence suggests that the Committee considered
the Option Proceeds excludable only via an express exclusion
clause.  There is also no evidence that non-qualified stock
options in general were not intended to be part of "total
compensation:" there is no affidavit from Gurley or other
officers who were with Stanadyne at the time the Pension Plan or
the Non-Qualified Plans were drafted to advise on intent.  See
Scipio, 119 F. App'x at 437 (noting that administrators properly
contacted CEO and other employees who could advise on intent at
the time the ERISA plan was drafted).

     In support of its contention that the evidence shows that
it had consistently interpreted the Non-Qualified Plans, the
Committee points to other cases, where consistent exclusion of
other items from pensionable earnings supported a conclusion
that the payment in question was also excludable.  Def.'s Mot.
25 (citing Karras v. First Colony Life Ins. Co. Pension Plan,
No. 6:05-cv-00031, 2006 WL 1049519 (W.D. Va. 2006); Chapman v.
Supplemental Benefit Ret. Plan of LIN TV Corp., 861 F. Supp. 2d
41 (D.R.I. 2012)).  In neither of those cases, however, had the

---

[17] To the extent that the Committee had referenced the 2005
Amendment in its denials of Kelly's claim, this reference is in
support of its argument that "total compensation" had always
excluded the Option Proceeds.  The Committee does not rely on
the 2005 Amendment as an independent basis for denying Kelly's
claim.

administrator been inconsistent in the exclusion of precisely
the payment in question -- as is the case here with the Option
Proceeds.  Nor had the administrator recharacterized and
mischaracterized evidence in a strained attempt to manufacture a
track record of consistency in the interpretation of an ERISA
plan where there was none.[18]

At this point, the Court could consider the potential
conflicts of interest resulting from the dual role of the
Committee's members as officers of Stanadyne concerned with the
firm's finances and as administrator of the pension plans.  See
Roganti, 786 F. 3d at 218.  The Court, however, has sufficient
evidence to conclude that the Committee's interpretation of the
term "total compensation" to exclude the Option Proceeds is
unreasonable and need not resort to the "tiebreaker" conflict of
interest analysis.  Id.

**B.   Count II: Attorney's Fees**

Kelly requests attorneys' fees.  See Am. Compl. ¶¶ 52-55.
Under Section 502(g)(1) of ERISA, district courts have
discretion to award attorney's fees to either party.  29 U.S.C.

-------------------------

[18] In the briefs submitted to this Court, the Committee also
seems to make the point that it was never its intent to offer
such a "windfall" as would result from inclusion of the Option
Proceeds, to already highly compensated employees.  Def.'s Mot.
19.  If such an argument is indeed relevant, there is no such
evidence in the Record and the Committee never made this
argument during the internal appeal process.

§ 1132(g)(1).  "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating employee benefits rights." Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 47 (2d Cir. 2009) (internal quotation marks omitted).

Five factors guide such awards: "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." Id. (quoting Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987)).  When awarding fees, a Court may (not must) apply the above factors. Toussaint v. JJ Weiser, Inc., 648 F.3d 108, 110 (2d Cir. 2011).  "[S]ome degree of success on the merits" is required for awarding fees. Id. (internal citation and quotation marks omitted).

In the current action, after originally suing the wrong party, Kelly ultimately prevailed on his central claim after abandoning some of his less persuasive claims.

The Court does not find that the Committee acted in bad faith, because the key language was ambiguous and the Committee's contentions are not devoid of merit.  At the same

[45]

time, however, the Committee failed to consider all the
evidence.  It also failed to explain why it did not consider
certain evidence, in particular evidence that would have
undermined its justification for interpreting the Plan the way
it did; the Committee also recharacterized evidence to fit its
theory of intent.

Stanadyne has not disputed that it could pay attorneys'
fees.  Kelly has also prevailed on his SERP claim, which could
influence the benefits of other plan participants.  An award of
fees could deter the Committee from future unbalanced reviews of
plan participant benefits.  This Court, having properly declared
the law, however, adds no suggestion that the Committee will not
follow it in the future.  Should it not, there will be time
enough for attorneys' fees.  Here, upon the entire Record, the
Court decides not to award Kelly attorneys' fees.

**IV.  CONCLUSION**

For the foregoing reasons, the Court enters judgment in
favor of Kelly in his 29 U.S.C. § 1132(a)(1)(B) claim that the
Committee was arbitrary and capricious in denying his benefits
under the SERP.  The Court enters judgment in favor of the
Committee on Kelly's BEP-related claims and on his claims that
the ERISA's anti-cutback provision, 29 U.S.C. § 1054(g)(1) as
well as ERISA's notice provision, 29 U.S.C. § 1054(h) were

violated by the Committee.   The Court also enters judgment for
the Committee on Count II, denying attorney's fees to Kelly.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE